*ENOCH WOODBRIDGE,* Chief Judge,
*NOAH SMITH,* Assistant Judge.

————— ⊛ —————

### EBENEZER HARRIS, Esquire, Appellee,

*against*

### BIGELOW LAWRENCE, CHARLES DYER, DANIEL TINKUM, JOHN FULLER, ABEL HOUSE, SOLOMON FULLER, JOHN BURNET, and HOSEA FULLER.

In a declaration for a libel, if the plaintiff declares *quæ sequitur in his verbis, scilicit,* the minutest variance between the libel offered in evidence and the declaration, will be fatal. Intimation of the Court.

THIS was an action of trespass on the case brought by *Harris,* the appellee, against the appellants for a libel. Plaintiff declared, that for upwards of six years before the publication of the libel, he had been a good and faithful citizen of this and the *United States,* and

had been for six years aforesaid duly appointed by the Legislature of *Vermont*, commissioned and sworn to the office of Justice of the Peace within and for the County of *Bennington*, and to the time of the publication of the libel aforesaid, was always reputed, esteemed, and accepted amongst all his neighbours, &c. to be a person of good name, and also to have administered in his said office of Justice of the Peace as aforesaid, within his jurisdiction, with honesty, firmness, and impartiality, always conducting therein as became an upright magistrate of the people, and thereby acquiring large sums of money, to the comfortable support of himself and family, and great increase of his riches, to wit, at *Shaftsbury* aforesaid: yet the defendants, well knowing the premises, but falsely and maliciously contriving and intending to injure the plaintiff in his good name, and to prevent the Legislature of the State of *Vermont* from re-electing the plaintiff to the office of Justice of the Peace, and to ruin him in his reputation and credit therein, did, on the 27th day of *September*, A. D. 1799, at *Shaftsbury* aforesaid, write and publish the following false and scandalous libel to divers good people of this State, when in their General Assembly convened at *Windsor*, in the County of *Windsor*, at their stated sessions holden in the month of *October*, A. D. 1799, of and concerning the plaintiff, *in the words following*, to wit:

To the Honourable the Legislature of the State of *Vermont*, to be convened at *Windsor*, the second *Tuesday* of *October* next.

The petition and remonstrance of us the subscribers, inhabitants of *Shaftsbury*, in which we humbly state the following facts, relative to the conduct of *Ebenezer Harris*, Esquire, Justice of the Peace in said *Shaftsbury*, to wit:

The said *Ebenezer*, instead of preserving the peace, is himself a peace-breaker. He has been guilty of quarreling, threatening and fighting on the sabbath and other days. He has been guilty of over-reaching and obtaining an undue advantage in obtaining property of his neighbours. He does not possess that uprightness and integrity of heart and manners that become the man who is entrusted with the commission of the Peace. All which we are ready to prove.

We, therefore, confiding in the wisdom and uprightness of the Legislature, do solemnly protest against the appointment of the said *Ebenezer*, and as in duty bound shall ever pray.

*Shaftsbury*, 27th *September*, 1799.

Subscribed with the proper names of the defendants.

By the means of the writing and publishing of which false, malicious and defamatory libel, he the said *Ebenezer Harris* is greatly injured in his good name, fame, credit and reputation; and is brought nto public scandal, ignominy and disgrace among all his neighbours, friends and acquaintance, and those to whom the integrity and innocence of the said *Ebenezer* were unknown, have, from the time of the publishing the said libel, vehemently suspected the said *Ebenezer* to have been a breaker of the peace,

&c. *(as charged in the libel,)* and have on that account wholly refused, and still do more and more refuse to have any commerce, discourse or acquaintance with him, or to do business before him as a magistrate as aforesaid, as they were used and accustomed to do, and otherwise would have done, had not said false, &c. libel been written and published; and the said *Ebenezer* is otherwise greatly injured, &c. to his damage 10,000 dollars.

Harris<br>v.<br>Lawrence et al.

The defendants pleaded severally the general issue. Plaintiff joined. Defendants gave notice under the statute, that they should give the truth of the words in the supposed libel set forth in evidence on their defence; and the issues went to the Jury.

Plaintiff's counsel now offered to read in evidence a paper purporting to contain the libel declared upon.

The counsel for the defendants objected, alleging a variance between the libel declared on and that offered.

*Chauncey Langdon*, for defendants. The plaintiff declares, " *in the words following, to wit,*" yet the word " *heinous*" is in the paper offered in evidence, but omitted in the libel declared upon. There is also a variance in this: In the paper offered in evidence are the words " *obtaining property of his neighbours,*" simply; in the libel declared on, " *overreaching and obtaining an undue advantage in* obtaining property of his neighbours." The paper offered

Harris
v.
Lawrence et al.

in evidence appears to have been signed by the defendants and twelve others, making twenty signatures in the whole. The declaration merely states, " signed by the defendants, with their proper names."

There are two modes of declaring upon libels, to wit, *in hæc verba*, in these words, or *cujus tenor*, to this intent. So, when an act is relied upon in a declaration, you may generally declare *in hæc verba* or *cujus tenor*. But in libels, if a plaintiff elects to declare *in hæc verba*, he is bound. He cited *Jacob's Law Dict. Toml.* edit. under the head " *Libels ;*" *Gilbert's Law of Evidence*, p. 852. *Capel Loft's* edit. *Com. Dig.* vol. 4. p. 718. *Swift's System*, vol. 2. p. 50. Upon demurrer to a declaration upon a libel declared to be *in hæc verba*, *nor* for *not*, although expressing the same sense, was held to be fatal. *Read as advisory.* •

*David Fay, contra.* The authorities cited by Mr. *Langdon*, are all in cases of criminal prosecutions for libels. In such cases, more strictness is required in favour of the subject. No such decisions in civil cases can be produced. Again, there is a distinction betwixt the doctrine of libels as received in *England* and in this country. In our mode of judiciary process on libels, our opponents can shew no hardships suffered and no advantages gained by such omissions. If the *English* doctrine of libels applies here, why not adopt it to its greatest extent? The same books will shew, that defendants in *England* could not give the truth of the libellous matter in evidence. This would operate in such manner upon

their clients, as that they would not wish so far to re-
cognise the *English* doctrine of libels.

*Chauncey Langdon*, in reply. This kind of action
ought not to be favoured, and a person instituting it
ought to be well advised. No distinction can be
shewn between a civil action and an information for
a libel, as to the strictness required. Although no
injury can be shewn as suffered by defendants through
the introduction of this inapplicable paper, yet when
suitors seek for justice, they must pursue it in the
right way. If in the wrong mode, defendants have a
right to withstand such process as may not comport
with the regulations of Courts.

We deny that all our authorities were reports of
criminal process. The law writers cited speak of in-
formations and civil actions, and apply the doctrine
we contend for equally to each.

The doctrine as to justification, by proving the
truth of the words, does not apply to civil actions
more in *England* than here. But granting the cases
cited applied the doctrine exclusively to actions of a
criminal nature, and the truth in justification prohi-
bited in favour of the King, then surely the argu-
ments derived from it would apply with redoubled
force here. If in a government where the royal pre-
rogative and the characters of men in high office are
peculiarly guarded by the laws, so far that the truth
of a libel shall not be given in evidence in justifica-
tion, yet if even there they allow the slightest vari-
ance to avail in exception to evidence, surely in this
free country a still greater latitude should be allowed.
If the King, armed with the terrors of his royal prero-

21

gative, and jealous of his dignity, when he arraigns his subjects for libelling his sacred majesty, allows by law the subject the privilege of taking exceptions to any variance suffered by the mistake of his attorney-general, surely a republican citizen may expect the same privilege.

Mr. *Langdon* was proceeding to shew the importance of the variances excepted to in the demurrer to the evidence; but was interrupted by the Court, who intimated that their judgment would be against the admission of the paper offered in evidence.

*Fay* now moved to amend the declaration, to make it comport with the libel offered in evidence.

On trial to the Jury, the Court will on motion order the declaration amended upon payment of costs.

*Langdon* objected. The amendment prayed for must rest upon our statute, which is nearly a transcript of the several statutes of jeofails in *England*. Consequently the *English* authorities will well apply to shew how far amendments are allowable. The great principle of amendment, as laid down in the books, is, that there shall be something on record to amend by. But statutes of jeofail never were designed to encourage or aid the mistakes of counsel or attornies. Here the plaintiff has elected his mode to declare, and must be bound by it. There is no defect in the process or mode of bringing the action, and the declaration is apparently good, but a mere mistake of the attorney drafting the declaration has intervened. He cited *Com. Dig.* vol. 1. p. 453. 479. and proceeded—

'The present motion does not embrace a mere
amendment, such as is contemplated in the books,
but in fact goes to alter the very action itself. It
alters the whole defence. An amendment of this
nature would be novel in the decisions of the Court.
I well recollect, that some terms since the Court re-
fused permission, in *Rutland* County, so to amend a
declaration, as among several general to insert a spe-
cial count.

Harris<br>v.<br>Lawrence et al.

———— ————, in reply. The great object of all sta-
tutes of jeofails, and indeed it should be the great
object of Courts of Justice, to keep parties in Court
until justice be rendered to them. Our statute of
jeofails is very broad, contemplating all possible cases
of amendment short of creating a new action. This
very liberal act, which has freed justice from the
shackles of ancient techniæ, certainly should not be
limited by a recurrence to those very principles from
which it was designed to detach judicial proceedings.
Mr. *Langdon's* positions go to exclude all amend-
ments. Here neither the name or the nature of the
action or the pleadings, will be affected by the pro-
posed amendment. In *England* we shall shew by
the books their Courts have gone greater lengths.
*Burr. Rep.* vol. 2. p. 755. *Alder* v. *Chip.*

*Fay* likewise here read the case of *Bonfield, qui
tam,* v. *Milner, Burr. Rep.* vol. 2. p. 1098. and *Jac.
Law Dict. Tomlins's* edit. under head of " *Amend-
ment.*"

Harris
v.
Lawrence et al.

The Court allowed the plaintiff to amend under rule to pay costs to defendants.

The amendment was made *instanter*, and the cause proceeded to the Jury, who found their verdict for the plaintiff, one dollar damages and his costs.

*David Fay* and —— ——, for plaintiff,.
*Chauncey Langdon*, for defendants.